Good morning and welcome to the Ninth Circuit. We have quite a long docket this morning, so let's get right to it. We have two matters that are submitted on the briefs. Just for the record, that's UANIC v. Wawa Nessa General Insurance Company and Mantejo v. Kijikazi. And then we have five cases for argument. For those of you who are arguing, please note that the time that you're looking at on your timer is your full time. So if you want to reserve time as the appellant for rebuttal, you can let us know that, and we'll try to give you a cue and help you. But it's your job to monitor your time. The first case for argument this morning is Susan Smith v. Walgreens Boot Alliance, et al. Good morning, members of the panel. My name is Robert Redfern here for the appellant, Susan Smith. I'd like to reserve four minutes for rebuttal, if I could. So, members of the panel, this case comes before the panel on really a narrow procedural issue of whether the district court properly applied the standard under Rule 12b in dismissing our complaint. Our position is clearly that it did not. Understanding this case makes that clear. Susan Smith, who is here with me today, is disabled under any definition of the word, especially under the definition applied by the American with Disabilities Act, which applies a very broad definition. Her disability status is not disputed for purposes of this appeal. She has conditions and ailments that few people can understand. She requires opioid medication just to be able to attempt to live a semblance of a normal life that everyone else, you and I, take for granted on a daily basis. Now, this opioid prescription that she has was prescribed by her long-term treating physician who is duly licensed in the state of California and DEA registered. The prescriptions are legitimate and valid. When the national opioid abuse became widely publicized, however, there was a backlash that really caught up people like Susan Smith in the net. This is part of the problem. The CDC issued its guideline on opioid prescription in 2016. Walgreens and other pharmacies adopted or incorporated those guidelines into its policy in a way that was not intended and not proper. After that, Susan Smith suddenly found that she was having great difficulty and unable to get her prescriptions filled. Counsel, what you're arguing is that the policy is some sort of a proxy for discrimination. Can you please explain that? And I guess I'm not really understanding how you're concluding that given our precedent in Schmidt. Well, it's not that the policy per se is a proxy. What we're arguing is that the high-dose and duration opioid prescriptions are proxies for disability. I would submit that it is, frankly, to me, it's common sense. But I understand you can't take my submission. But we alleged three studies and an EEOC fact sheet in our third amended petition to address that very point, which was raised by the district court. But do any of the studies that you submitted indicate that there is this high-dose, continuous-use opioid connection with disabled folks? I mean, is that the connection in those studies, or are they just talking about folks who take medication? Well, it's not. Frankly, I don't remember the details of each and every one of them. I do remember that the USDA report states specifically that there is a very strong, extremely strong link between disability and opioid medication. Now, most of the opioid medication they were looking at were on the higher levels, although I don't remember how much specificity was given in each particular study. However, if you look at our reply brief where I talk about the studies in detail, there was one study that really was focusing on higher-level opioid prescriptions and dose and duration prescriptions, which I would say under the plausibility standard of Rule 12b, which is what we're here under, that should be more than sufficient at this point in time. In fact, if you really look at the brief of Walgreens, they take a very deep dive into these studies and is asking this court to take a deep look at it to try to convince this court that those studies do not have any merit, should not be considered, do not lend themselves to plausibility. But that's really not what we're here about. That's not what Rule 12b requires. Again, it only needs to be plausible. It doesn't need to be probable. It only needs to give the rise of mere possibility. In fact, what's interesting is Walgreens in its brief concedes, as it calls it, that these studies provide some correlation between disability and opioid prescriptions. That's the term they use. But they make a really interesting statement, which they go on to say, however, it doesn't cross the critical threshold of showing the link. Now, Walgreens, I don't know what critical threshold means. Walgreens doesn't define it in its brief. It just simply repeats and repeats that we haven't met it and therefore the dismissal was proper. But again, that's not the standard. I believe under plausibility even some correlation is sufficient. But as we've just discussed, there's a lot more than just simply some correlation. These studies, as I already pointed out, and one in particular, talk about a very strong link between opioid medication and disability. But it's not opioid medication. It's high-dose, continuous-use opioids. That's what the policy is targeting. That's different than what you're saying, isn't it? Well, I'm not sure, Your Honor. The fact is some of these do refer to higher-level dose and duration opioids. I would still submit, and again, I don't remember the specifics of all the studies if they address the levels of opioid prescriptions and the linkage to disability. But I would still submit that under the Rule 12B. But that's how the district court defined the benefit, right? I'm not sure that the district court did. I think the district court did question whether we had adequately alleged a link. And then the problem was the district court just simply really, in two very general sweeping statements, dismissed the studies we cited and just said they didn't give enough detail. Again, under the plausibility standard, we submit that the detail level being required by the district court and by Walgreens is completely improper under Rule 12B. Do you want to reserve your time? I do. Unless the panel has any questions, thank you. Good morning. May it please the Court. Lauren Blass, Gibson-Duncan Crutcher on behalf of Walgreens. A plaintiff was given leave to amend three times in this case before her case was dismissed. Her final attempt hinges on her claim that opioid prescriptions exceeding 90 MMEs and seven days duration are a proxy for disability. She was very specific about that in the complaint, and the class definition is very specifically tied to that threshold. The trouble with this is she hasn't provided any facts to allow this court to assess under the court's decision in Schmidt, who is covered by this proxy and whether there's a sufficiently close link with disability. That's what this court's precedents ask us to examine. At best, her counsel alluded to a handful of studies purporting to show a link between higher opioid prescriptions and disability and or that disabled people are three times as likely as non-disabled people to have a prescription over 90 MMEs per day. But Judge Breyer correctly concluded that neither of these facts makes her claim plausible. As Judge Mendoza keyed into, the link between higher opioid prescriptions generally and disability doesn't get her there because it doesn't actually track the proxy. She's not claiming Walgreens is discriminating against people with opioid prescriptions in general or even higher prescriptions, whatever that might mean. She's very specifically claiming discrimination against this particular kind of prescription, higher than 90 MMEs and longer than seven days. It could well be that most disabled people, even if they have higher prescriptions, fall well below this threshold, which would undermine any inference that the threshold is discriminatory. So at best, that fact establishes nothing more than a sheer possibility that thresholds are a proxy for disability, which, as this court well knows, falls well short of what's required at the pleading stage. With respect to the claim that disabled individuals are three times as likely to have a prescription over 90 MMEs, that comes from the Applied Health Economics Study, which is included at our request for judicial notice. This is equally unhelpful because it doesn't provide any facts about the number of people who have one of these prescriptions to begin with. Let's simple example. If 1% of non-disabled people with an opioid prescription have one that's over 90 MMEs per day and 3% of disabled people have such a prescription, we still need to look at how many people have one of these prescriptions to start. If a million non-disabled people have one of those prescriptions and 100,000 disabled people do, then even the higher rates for the disabled population are not going to offset the vastly larger share of people, non-disabled people, that have one of these prescriptions. And indeed, that is supported by one of the studies that plaintiffs cite. It suggests that there are many more non-disabled individuals who have one of these prescriptions. That undermines the fit of her proxy entirely, and the absence of facts about the proportion of disabled individuals who is covered by this proxy really cuts across all of her claims and theories in one way or another. We've spent most of our time, and counsel spent most of his time talking about the disparate treatment claim, the intentional discrimination claim, but the same logic requires dismissal of her other claims as well. So with respect to disparate impact, that claim turns on her assertion that disabled individuals have these prescriptions at higher rates, but that's not really the relevant question. The relevant question is whether they are denied meaningful access to those prescriptions at higher rates. Her whole theory turns on an assumption that everyone who has one of these prescriptions is disabled, but as discussed, she doesn't provide sufficient facts to support that inference under Schmidt, and therefore we can't infer that everyone who's on that side of the line is having their access restricted in some way. Counsel, the issue that we're defining the benefit as access to the opioids in this quantity and that amount of time, would it be important to have defined the benefit differently if they wanted to be successful? In other words, isn't the nature of the benefit here access to quality care? And isn't that, if they had that argument, which I'm not sure they do, that would be more consistent to what the court has decided in Doe versus CVS? I don't think that sort of up-leveling the benefit really makes any difference to the analysis. At the end of the day, we still don't have the information that Schmidt requires to assess the fit of the proxy. What we have is a policy that, on its face, applies equally to disabled and non-disabled individuals, and even if we were to find that at higher levels of care, there aren't any allegations suggesting that disabled individuals are being denied that care in a different way than non-disabled individuals. We would submit that as the relevant question. That's what Doe versus CVS requires us to look at. Even though the standard is meaningful access, it's still a comparative standard. It isn't just, I've been denied access, therefore I've stated a claim. I've been denied access in a way that is different from another group of people. Well, on the bottom line, they didn't make the argument below, did they? They did not. I think the same logic dooms the accommodation claim. The standard under Baumann and Fortune is for a place of public accommodation to provide a like experience, in the same way that she hasn't alleged that there is any differential between disabled and non-disabled individuals' experience with this policy. There's no basis to infer that any accommodation is reasonable or necessary, or even that she's alleged as much in her complaint. So, bottom line, the court has, the district court really gave her every opportunity to plead her claim. There were three chances to amend. This case has been going for almost three years in one form or another. She hasn't given us any reason to think that the allegations are going to come out any different. The next go-around, there's nothing in her brief, there's nothing otherwise to suggest that there would be any different outcome below. So we would respectfully ask that the court affirm the dismissal. If there are no further questions, I will sit down. Thank you, counsel. Your Honor, you asked the question about whether we define the benefit as access to health care, and frankly, we did. It certainly is subsumed within our complaint. We may not have used magic words, but what we've talked about and what's consistent here is you have disabled people who cannot get their valid and legitimate prescriptions filled. Without those prescriptions filled, they have serious problems. I would direct the court to its Crowder case. This is very similar. You may recall in Crowder, the issue was that Hawaii quarantined emotional or support animals for 14 days when people came to visit. And what the court said was, yes, this applied to everybody, whether you were disabled or not, but it affected blind people with a much greater burden than it did other people. Someone who is not blind, even without their animal, can go see the island and walk around and enjoy its pleasures. The blind person couldn't without the animal. And what the court said was, this actually burdens the disabled in a manner different and greater than others. That's exactly what we have here. Disabled people who need these high-level dose and duration prescriptions, when they don't get those prescriptions, they can't live a normal life, again, like you and I. The burden on them is much greater than it is on anyone, the other people, and certainly than the non-disabled. What about somebody who has an acute injury? They're much different. I mean, anybody who doesn't get the prescription because of the policy in effect is going to be impacted, right? Well, there's going to be impacts, but they're not nearly as great. So you may have a little bit more pain for a little bit longer. You know, the acute injury, what we're talking about there is, say you have a surgery, knee, shoulder, something like that, so you get some pain medication for a couple days until the swelling goes down and the healing begins. That's not what we're talking about. The people with these high-dose and duration prescriptions, they need them so that they can live just a regular life every single day. Without them, their life is debilitated. They can't live, they can't function. Frankly, it leads to suicides in many cases. So it's not the same, and that's really the problem that you highlight. The CDC guideline was intended for acute pain patients, but it's being applied to non-acute situations, hence the problem. The ultimate, the bigger problem that we are trying to resolve here is, again, with regard to the national opioid problem. They are sweeping too far. The baby is being thrown out with the bathwater. The innocent people with valid and legitimate prescriptions can no longer get them filled. I would point out that here in California, there's actually a specific requirement that pharmacists are required to fill valid and legitimate prescriptions, or stated another way, they're required to fill the prescriptions unless, for professional judgment reasons, they think they are improper. We don't have that here. They are just simply being filled or not filled because of the dose and duration and the fact that they deal with opioids, which now have a bad name. To be clear, we're not asking that every opioid prescription be filled just because it's been presented. What we are saying is that valid and legitimate prescriptions should be filled so that disabled people, such as Susan Smith, can live or try to live as normal of a life as you and I do. Thank you. All right, thank you, counsel, for your arguments. The matter of Smith v. Walgreens Boot Alliance et al. is submitted.
judges: THOMAS, FORREST, MENDOZA